**UNITED STATES of America,**

v.

**Francis VETERE, Defendant.**

**No. 87 Cr. 0098 (RWS).**

United States District Court,
S.D. New York.

May 27, 1987.

L.Ed.2d at 500. This Court is only 65 miles from the state court in Waverly, Tennessee.

**382**

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for U.S.

Shanley & Fisher, P.C., Morristown, N.J., for defendant.

OPINION

SWEET, District Judge.

Defendant Francis Vetere ("Vetere"), who has been tried and convicted of kidnapping, has moved pursuant to Fed.R.Crim.P. 12 for the dismissal of his indictment on the grounds of prosecutorial misconduct before the grand jury that indicted him. For the reasons set forth below, the motion is granted and the indictment dismissed. Pursuant to Fed.R.Crim.P. 12(h), Vetere's bail conditions shall be continued for 30 days to allow the government to file a new indictment or to appeal.

**PRIOR PROCEEDINGS**

Vetere was tried and convicted by a jury of a violation of 18 U.S.C. § 1201(a)(1) for kidnapping Mark Bryant ("Bryant"), and taking him from the Bronx to New Jersey at gunpoint. According to the government, Vetere kidnapped Bryant, a so-called "Gypsy cab" driver operating a private vehicle, in order to get home in the middle of the night. Vetere's defense at trial was that Bryant did indeed drive him from the Bronx to New Jersey, but that it was not at gun point, that Vetere had only refused to pay for a cab-ride to New Jersey, and that Bryant had brought these charges to retaliate. After due deliberation, the jury found Vetere guilty as charged.

The morning of the trial, April 13, 1987, pursuant to Fed.R.Crim.P. 16(a)(2) and 18 U.S.C. § 3500, the government turned over to Vetere the grand jury testimony given by an FBI agent because the agent was expected to testify at trial. Vetere had by motion requested that this material be turned over earlier, which had been denied. The testimony turned over to Vetere reflected the Agent's remarks, but not, of course, any colloquy between the Assistant United States Attorney and the grand jurors.

Immediately upon receiving the grand jury minutes, Vetere moved for dismissal of the indictment on the grounds of prosecutorial misconduct in the grand jury, specifically, that the Assistant United States Attorney had unfairly solicited testimony about Vetere's past record in order to get a

reluctant grand jury to vote an indictment. The Assistant conceded that he had solicited such information but represented to the court that he had done so at the behest of the grand jurors and sought leave to have his colloquies with the grand jurors transcribed and considered with respect to Vetere's motion to dismiss the indictment. The court indicated that it would await the submission of the missing portions, and for the sake of judicial economy, proceeded with the trial pending receipt of the minutes, because the parties, witnesses, and a jury panel were all present.

As both the trial and grand jury testimony established, on November 29, 1986, at approximately two in the morning, Vetere jumped into Bryant's car in the Bronx and was driving to Cresskill, New Jersey where he lived. After Vetere left the car, Bryant found a Cresskill police officer and drove around the community seeking, finally successfully, to locate the house at which Vetere had left the car, which proved to be around the corner from Vetere's home. No further investigation was conducted that night. Thereafter, the FBI got Vetere's name from the local police as a suspect, and a photo array was shown to Bryant who identified Vetere.

The complete grand jury minutes were received after completion of the government's case, which reserved the defendant's rights relative to its Rule 12 motion to dismiss on the grounds of the grand jury proceedings. A hearing was held on the motion while the jury was deliberating.

When the jury returned with a verdict, the court elected to receive the verdict rather than to hold the jury pending a decision on the motion. *See* Fed.R.Crim.P. 12(e). As already noted, the jury convicted Vetere, and sentencing was set for May 28, 1987. Parties requested and received leave to submit papers on their position after the trial, and the motion to dismiss the indictment was marked fully submitted on May 12, 1987.

## THE GRAND JURY PROCEEDINGS

The Grand Jury testimony that was presented—most of which was hearsay or double hearsay—contained factual errors about the offense and factual errors about the target's background. In addition, the grand jurors received non-relevant, highly prejudicial, and erroneous information about Vetere's criminal record. Finally, instructions on the law were given which could be considered erroneous and misleading.

At the outset of the proceedings before the newly empanelled grand jury, the grand jurors were told with respect to Vetere's motive "We don't know all the answers today. What I can tell you, and *instruct you as a matter of law,* is, the reasons that—or, *the motive for this kidnapping, is irrelevant to the question that is before you today."* Trans. at 4. (emphasis added). However, for any crime, motive is *relevant*[1] to establishing whether or not a crime was committed and, if so, who committed it. Indeed one of the elements of the kidnapping offense with which Vetere was charged[2] is that the government must prove that the defendant kidnapped the victim in order "to secure some benefit to himself." *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936).[3] Thus, motive was relevant and the Grand Jury may have been misled in this regard.

Despite this advice, relatively late in the grand jury proceedings, a grand juror asked whether there was any information about the motive for the kidnapping and was told: *"I instruct you, as a matter of law,*—You can certainly ask the question, but *the question of motives is not before*

---

**1.** " 'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.

**2.** 18 U.S.C. § 1201(a)(1).

**3.** *See also* L. Sand, J. Siffert, S. Reiss, J. Sexton & J. Thorpe, 1 *Modern Federal Jury Instructions,* para. 42.01, instruction 42–4, at p. 42–11 (1986) ("It is sufficient to satisfy this element if the government proves that at the time the defendant took [name hostage], he did so for the purpose or reason charged in the indictment.").

*you."* Trans. at 42. The Assistant added: "You can ask Agent Sager, if you would like him to, to speculate. We can ask him that. But I think that's improper. But if you insist, I will ask Agent Sager." *Id.* Although the record does not reflect any grand juror insisting on the elicitation of this speculation, the Assistant asked the Agent nonetheless:

> Q ` ... I am going to caution you, Agent Sager, for the record, I am going to be indicating this as speculation,—and I hesitate to ask this question—but the Grand Jury expressed an interest to have you speculate—
>
> What is your best understanding of the reason why Mr. Vetere was in the Bronx that evening of the kidnapping, and why he performed the kidnapping?
>
> A It's purely speculation. I am aware of the fact that his wife lives in the Bronx—they're separated. *He has a history of using drugs and drug related arrests;* and that is a drug-prone area as far as I know.

Trans. at 45–46 (emphasis added).

During the hearing on Vetere's motion to dismiss the indictment, Agent Sager conceded that the *only* basis for testifying that Vetere was a drug *user* was a single arrest for the criminal sale of methadone that Sager had incorrectly surmised had resulted in a felony conviction for the same offense. In fact the charge to which Vetere pled had been reduced to a Class B misdemeanor. Even had Sager been correct in assuming there had been a felony conviction, selling drugs does not equate to use, and one arrest is very different from having a "history of ... drug related arrests." Thus with respect to the issue of motive, the grand jury was incorrectly advised about its legal significance, and then presented with "speculation" from an FBI agent which was inadequately supported based on the documents available to the agent.

Although all the evidence to the grand jury was presented on one day, Agent Sager, the FBI case agent was recalled five times. On one such occasion, erroneous testimony was given on the issue of the identification of the defendant. In one of his earlier sessions before the grand jury, Agent Sager testified that the victim had told him that Vetere had kidnapped him by getting into the front seat of his car with a rifle. But, at trial, the victim testified that Vetere had gotten into the back seat of the car, and was carrying a pistol, not a rifle. Agent Sager then took the stand and testified that he had misreported Bryant's statement to the grand jury, and that Bryant had indeed told him the same version of events that he had testified to in court.

Sager's testimony on where Vetere had been sitting had been important to the grand jury. One of the grand jurors had doubted that an accurate identification could be made by the driver of a car at night with a gun trained on him. Another juror made a comment about the lighting conditions near the George Washington bridge, which the kidnapped car had crossed. When Agent Sager was recalled to the grand jury on the question of identification, he was asked: "To your knowledge, did Mr. Bryant have an opportunity to see Mr. Vetere *as he was seated right next to him in the passenger seat?"* Trans. at 24 (emphasis added). The answer: "Yes." *Id.*

█ Although there is no indication that the government was deliberately proceeding by proffering erroneous information, it was, of course, the government's choice to proceed through hearsay, despite repeated admonitions from the Circuit to avoid it, *see, e.g., United States v. Hogan,* 712 F.2d 757, 761 (2d Cir.1983) ("Heavy reliance on secondary evidence is disfavored precisely because it is not first-rate proof. It should not be used without cogent reason."); *United States v. Estepa,* 471 F.2d 1132, 1135 (2d Cir.1972) (condemning "casual attitude" towards hearsay), and the consideration by the grand jury of the mistaken information must consequently be laid at the government's doorstep in the absence of any showing of the unavailability of the complaining witness.

At another point of the grand jury proceedings, a grand juror expressed concern

about the thinness of the evidence presented so far: "The question I am trying to get at,—Is there enough probable cause for us to pass judgment?" Trans. at 31. The Assistant replied, "We will ask Agent Sager," *id.,* thus failing to distinguish for the grand jury their role from that of an FBI agent. The grand jury was told, however, in response to a question concerning the seriousness of the crime: "In my own views, and I think they're the same in the U.S. Attorneys Office, every crime is a serious crime. And kidnapping, is especially a serious crime." Trans. at 26. This was coupled with remarks about Vetere that subsequently proved to be false. First, Sager was permitted to explain that the Cresskill police immediately suspected Vetere of this crime because small town police departments "keep tabs on people that are known to either commit crimes, or have committed crimes in the past.... Vetere was known to them as having committed a crime in New York City; and they knew this because it was publicized in the local paper." Trans. at 34.

Then during one of Sager's absences from the grand jury, a juror asked the Assistant what Vetere's prior offense had been:

A JUROR: I know someone asked this already,—There was a crime mentioned previously, of the victim—Did you ask the question about what he was accused of, before? I know you said it was irrelevant. I don't feel that's irrelevant....

[Assistant]: Okay. I will ask again.

Trans. at 42.

When Agent Sager was brought back into the room, the Assistant asked the following questions:

[Assistant:] ... Now, you mentioned that Mr. Vetere was known by the Cresskill Police because of some prior relationship with law enforcement officials. To the best of your knowledge, would you please tell the Grand Jury, what, to your knowledge, is Mr. Vetere's arrest and criminal record? ... Before your answer that, I want to put on the record—*I realize this may be prejudicial to the defendant*—and I am asking you this

question with some hesitation—but the Grand Jury has expressed an interest in it, and I will go ahead and ask Agent Sager.

[Sager:] Based on the arrest and criminal record sheet I have,—which may or may not be complete—he had several arrests. The first being in April of '85 for criminal sale of methadone, which is a Class C felony, and acting in a manner to endanger a child, which was a Class A misdemeanor.

[Assistant:] What is the disposition?

[Sager:] He was convicted.

The other arrest I have on this sheet is in September of '86, three charges—assault with intent to cause physical injury, which is a felony; burglary in the third, which is a felony; and criminal mischief in the third, which is a Class E felony.

[Assistant:] To your knowledge are those charges still pending?

[Sager:] Yes.

[Assistant:] Do you have any other information relating to Mr. Vetere?

[Sager:] Yes. This was sent by the Cresskill Police Department, a brief write-up, or clipping, indicating Vetere was arrested on December 8 on a purse snatching charge which originated in the 34th Precinct in upper Manhattan.

[Assistant:] When you say "clipping", do you mean a newspaper report of that incident?

[Sager:] Yes.

Trans. at 44–45.

In the hearing on this motion it was established that the newspaper report in question was ten years old and reported an arrest for which Vetere had never been convicted. No evidence was adduced whatsoever to establish that Vetere was ever charged with acting in a manner to endanger a child.

As to the "history of using drugs and drug related arrests" testified to by Sager, he had told the grand jury that the offense for which Vetere was arrested, the criminal sale of methadone, was a Class C felony, and that Vetere had been convicted of that, too. In fact, it was revealed at the hearing that Vetere had been convicted only of a

Class B misdemeanor in connection with the incident, which had carried but a $500 fine. Finally, the charges with respect to assault, burglary and criminal mischief, which Agent Sager reported to the grand jury, all related to a single family incident, to which Vetere was permitted to plead guilty to a charge of disorderly conduct.

Also at the hearing, Agent Sager testified that he had not prepared for his grand jury appearance before testifying, not even by reviewing his notes.

## IMPROPER PROCEEDINGS BEFORE THE GRAND JURY AS GROUNDS FOR DISMISSING THE INDICTMENT

■ The issue in this case is whether the court should use its general supervisory authority to dismiss a grand jury indictment even after a petit jury has found the defendant guilty beyond a reasonable doubt of the charges brought in the indictment. "The law of this Circuit is that dismissal of an indictment is justified ... pursuant to our supervisory power, to prevent prosecutorial impairment of the grand jury's independent role." *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir.1983). Supervisory power can be exercised to impose an *"ad hoc sanction"* to enforce the appropriate performance of the government in presenting evidence to the grand jury. *United States v. Jacobs*, 547 F.2d 772, 778 (2d Cir.1976), *cert. granted*, 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 254 (1977), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978); *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir.1972). The exercise of the court's supervisory power can extend beyond the minimum requirements set by the Constitution to encourage fair and uniform procedures in the prosecution of criminal actions. *United States v. Jacobs*, 547 F.2d 772, 776 (2d Cir.1976).

■ The Second Circuit has admonished district courts to oversee the conduct of prosecutors particularly carefully with respect to grand juries. Incorporated into the Bill of Rights as a bulkward against unfounded government prosecution, the grand jury has lost some of its potency as a shield. "[P]rosecutors, by virtue of their position, have gained such influence over grand juries that these bodies' historic independence has been eroded." *Hogan*, 712 F.2d at 759. This "gain in prosecutors' influence over grand juries is all the more reason to insist that ... limitations [on prosecutorial presentations] be observed strictly." *Id.*[4] Thus in choosing when to exercise its supervisory power, a court must be mindful of echoes of Fifth Amendment rights—both of the right to due process and the right to an independent grand jury.

■ A court has a variety of supervisory tools at its disposal. It can admonish a prosecutor—although it has often been noted how fruitless this is. *See, e.g., Estepa*, 471 F.2d at 1137 ("We cannot ... content ourselves with yet another admonition."). Under some circumstances, it may be appropriate to hold an Assistant in contempt of court. *See* Fed.R.Crim.P. 42(a). Finally, under the proper circumstances, it is appropriate to dismiss the indictment, even (as was the case in *Hogan*) if a petit jury has already returned a conviction on the charges in the indictment. 712 F.2d at 757; *see also United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir.1984), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

■ A supervisory dismissal is "warranted only where the prosecutor's conduct amounts to a ... reckless misleading of the grand jury as to an essential fact." *United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir.1984), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). In this case, the prosecutor's presentation both with respect to the facts and the law, amounts to impermissible "prosecutorial impairment of the grand jury's independent role." *Hogan*, 712 F.2d at 761. The presention and misrepresentations of Vet-

---

**4.** In *United States v. Serubo*, 604 F.2d 807, 816 (3d Cir.1979), the Third Circuit wrote: "Aware of the potential for abuse inherent in grand jury proceedings, this court and others have increas-ingly exercised our supervisory power over the administration of justice to regulate the manner in which grand jury investigations are conducted."

ere's record based on a ten-year old newspaper article to the grand jury, upon which the agent "speculated" must be condemned. This degree of inaccuracy is impermissible when a person's liberty is at stake.

Indeed, the use of Vetere's record crossed the line from being simply reckless to being the "fundamentally unfair" tactic of depicting a grand jury target as a "bad person[ ] and thereby obtain[ing] an indictment for independent crimes." *Hogan*, 712 F.2d at 761. The flow of the questions to Agent Sager and the colloquy while he was excused, establishes that the testimony about Vetere's record was elicited to help push a wavering grand jury over the edge. Put together, the use of the ten-year old article, *see Hogan*, 712 F.2d at 760 (information put before grand jury from a current newspaper article), the characterization of Vetere as a drug user with a "history of ... drug related arrests," from a single incident in which he was charged with a drug sale, the representation that he had been convicted of offenses that he, in fact, had never been charged with, and the misrepresentation of charges of which he had been convicted all bear not on whether Vetere committed this crime, but on a "bad-guy" theory.

■ This is not, of course, to say that a target's criminal record can never be before a grand jury, because under the law of this Circuit there are times when it can. *See United States v. Camporeale*, 515 F.2d 184, 189 (2d Cir.1975). Nor is this a case where an error in a record is so minute as to be legally insignificant, as in *United States v. Levine*, 700 F.2d 1176, (8th Cir. 1983), in which a grand jury was told that a defendant had been convicted of "mail theft" when in fact he had been convicted of "possession of mail." Here, the distortion of Vetere's record is substantial, based in part on allegations in an ancient newspaper article, containing at least one offense that is apparently fictional, and listing very serious sounding charges that, in fact, were pled down to minor ones or dismissed.

Of course dismissing the indictment will still subject Vetere to reindictment, a cost society and the victim will have to bear as a consequence of this exercise of supervisory power by the court. In this case, the burden of retrial is not unusually heavy because the trial was short, and although a retrial will undoubtedly inconvenience Bryant, his composure on the stand last trial shows that this is not an instance where the simple act of testifying approached the trauma of the incident itself, as is true for some victims of some crimes.

Finally, in its papers on this motion, the government has charged the defense counsel of misconduct. The grounds for this are that before the trial, defense counsel had filed a notice of alibi pursuant to Fed. R.Crim.P. 12.1. The noticed alibi witness was Vetere's father, who, it was represented, was going to testify that Vetere had been at home at the time of the kidnapping.

At the close of the government's case, the defense chose not to put on a case of its own, but rather to argue to the jury that it should draw certain inferences in favor of Vetere based on evidence adduced from the government's witnesses. Specifically, defense counsel asked the jury to conclude that Vetere had not kidnapped Bryant, but had merely refused to pay him his fare.

■ However, there is nothing in the record to suggest even remotely that defense counsel's original notice of alibi had been made in bad faith. The inferences that defense counsel asked the jury to draw from the government's witnesses' testimony were well within the wide bounds afforded vigorous defense counsel, even though directly contradicted by the victim's testimony.

## THE EFFECT OF THE JURY VERDICT

The conclusions set forth above are not altered by the fact of the defendant's conviction. The government has urged that such a result is foreclosed by *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), in which the Supreme Court held that a guilty verdict by a petit jury at trial cured any defect in a

grand jury indictment related to the lack of probable cause:

> [T]he petit jury's ... guilty verdict not only means that there was probable cause to believe that the defendants were guilty as charged, but that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 942 (footnote omitted). With this reasoning, *Mechanik* reversed a court of appeals decision that had established an automatic rule that indictments should be dismissed for a technical violation of the grand jury rules set forth in Fed.R.Crim.P. 6.[5]

*Mechanik* did not address the issue here: whether prosecutorial misconduct before the grand jury calls for the exercise of the court's inherent supervisory powers in an individual case. As the Tenth Circuit has noted, "*Mechanik* was carefully crafted along very narrow lines...." *United States v. Taylor*, 798 F.2d 1337 (10th Cir. 1986). The court observed, "In *Mechanik*, no allegations were made that the government attempted to unfairly sway the grand jury or to otherwise affect the fairness of the accusatory process." *Id.*

■ *Mechanik* lacks any discussion about the court's supervisory powers, and, consequently, it cannot be presumed that the decision silently eliminates the traditional and fundamental judicial supervisory power, particularly when that power is exercised on a case by case basis. Viewed this way, *Mechanik* leaves in effect the rule in this Circuit that after a guilty verdict at trial, "dismissal of the indictment can be justified only as a method of deterring prosecutorial misconduct." *United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir.1984), *cert. denied*, 472 U.S. 1010, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

## CONCLUSION

For the foregoing reason, the indictment will be dismissed. Pursuant to Fed.R. Crim.P. 12(h), bail will be continued under its present conditions for 30 days, to allow the government to file a new indictment or to appeal.

IT IS SO ORDERED.

---

5. It seemed also to move the *Mechanik* court that the trial being set aside had lasted for three months, *id.* 106 S.Ct. at 941, as opposed to the three days in this case.