**UNITED STATES of America, Appellee,**

v.

**BRITO, et al., Defendants.**

**Appeal of Vincente CARHUAPOMA, a/k/a "Vincente Carhuapoma Hartley", and German Salcedo, Defendants.**

**Nos. 1165, 1356, Dockets 89–1554, 89–1565.**

United States Court of Appeals, Second Circuit.

Argued May 18, 1990.

Decided June 29, 1990.

Mark B. Gombiner, The Legal Aid Society, Federal Defender Services Appeals Unit, New York City, for appellant Carhuapoma.

Edward T. McCormack, Garrison, N.Y., for appellant Salcedo.

Martin Klotz, New York City, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty., Kerri Martin Bartlett, Asst. U.S. Atty., of counsel), for appellee.

Before OAKES, Chief Judge, PIERCE and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Defendants German Salcedo and Vincente Carhuapoma appeal from judgments of conviction entered against them in the United States District Court for the Southern District of New York, Robert J. Ward, Judge, arising from their participation in narcotics trafficking in New York City.

Among their arguments, defendants claim a misuse of the grand jury process by the office of the United States Attorney for the Southern District of New York. Although this issue is troubling, we affirm the convictions because defendants have suffered no prejudice from the prosecutor's conduct before the grand jury, and because their other claims lack merit.

## BACKGROUND

On July 14, 1988, German Salcedo and Victor Brito, a codefendant, were delivering mattresses in a truck in New York City. In the course of their deliveries, they parked the truck, and Brito entered a restaurant where he negotiated a deal to sell four kilograms of cocaine to two informants, Miguel and Eddie. Later that afternoon, Salcedo and Brito again parked the truck at a pre-arranged location in the Bronx, and Brito confirmed with Miguel that the proposed sale would be completed at Brito's nearby apartment. Miguel refused to go to Brito's apartment until he had seen the cocaine, but he agreed to wait in the lobby of the building for Brito to bring it down. Salcedo had already gone up to the apartment, and Brito followed him shortly thereafter.

A few minutes later, accompanied by Vincente Carhuapoma who was carrying a paper bag, Brito returned to the lobby, took the bag from Carhuapoma, and gave it to Miguel to inspect. It contained only one kilogram of cocaine, and Carhuapoma explained that the rest of it was upstairs in Brito's apartment. Miguel told Brito to get the money for the deal from Eddie who was waiting outside. Once outside, Brito was arrested. Carhuapoma was then arrested in the lobby while holding the bag. Drug enforcement agents next proceeded to Brito's apartment where they arrested Salcedo and found a triple-beam scale and a gun. The agents retrieved a shopping bag containing three kilograms of cocaine from the pavement beneath an open window in Brito's apartment.

Brito, Salcedo, and Carhuapoma were charged with conspiracy to distribute cocaine, 21 U.S.C. § 846, and possessing with intent to distribute four kilograms of cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(B). Brito was also charged with using and possessing a firearm during a drug trafficking offense, 18 U.S.C. § 924(c); he pled guilty to the conspiracy and the weapons charges, was sentenced, and does not appeal here.

After trial, Salcedo was convicted on both charges and sentenced to seven years in prison with four years of supervised release. Carhuapoma was convicted only of possession and sentenced to five years in prison with four years of supervised release. Both appeal.

## DISCUSSION

Salcedo and Carhuapoma seek reversal and dismissal of their indictments because of prosecutorial misconduct before the grand jury. In particular, Carhuapoma claims that the prosecutor misused the grand jury process first by obtaining the indictments solely on the basis of hearsay and later by preventing him from gaining access to grand jury material. Salcedo argues in addition that the prosecutor misused the grand jury by presenting testimony solely for the purpose of "locking in" a witness's testimony. Salcedo also contends that the evidence against him was insufficient for conviction, that the trial court erred in charging the jury on conscious avoidance, and that other errors were committed.

### A. Misuse of the Grand Jury

Historically, the grand jury has "serve[d] the invaluable function in our society of standing between the accuser and the accused". *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). It "provide[s] a fair method for instituting criminal proceedings against persons believed to have committed crimes", *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956), by assembling a group of citizens to assess "the likelihood of prosecutorial success" and to protect the innocent from unwarranted prosecution. *United States v. Umans*, 368 F.2d 725, 730 (2d Cir.1966). Despite the "high place [the grand jury holds] as an instrument of justice", *Costello*, 350 U.S. at 362, 76 S.Ct. at 408, the social costs of dismissing an indictment because of an imperfect grand jury proceeding are simply too high to accept when the defendant has been convicted after a full and fair trial and no harm has been done. *United States v. Mechanik*, 475 U.S. 66, 72–73, 106 S.Ct. 938, 942–43, 89 L.Ed.2d 50 (1986); *see Bank of Nova Scotia v. United States*, 487 U.S. 250, 254–55, 108 S.Ct. 2369, 2373–74, 101 L.Ed.2d 228 (1988).

■ Even so, pursuant to our supervisory power, we may dismiss an indictment for prosecutorial misconduct if the grand jury was misled or misinformed, *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir.1983); *United States v. Estepa*, 471 F.2d 1132, 1136 (2d Cir.1972); *see Nova Scotia*, 487 U.S. at 256, 108 S.Ct. at 2374 (" 'grave doubt' that the decision to indict was free from the substantial influence of [the misconduct]"), or possibly if there is "a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process". *Nova Scotia*, 487 U.S. at 259, 108 S.Ct. at 2376.

■ Carhuapoma asks us to exercise our supervisory power, reverse his conviction, and dismiss his indictment because of prosecutorial misuse of the grand jury, claiming that his indictment was merely one of a series of indictments obtained through the government's policy of using a single witness to testify in grand jury proceedings. In particular, he asserts that his indictment was based solely on hearsay testimony given by an agent having no personal knowledge of the alleged acts; that the grand jury was never clearly informed that the agent's testimony was hearsay; and that the prosecutor, herself, was the "true" witness because the agent's testimony was presented through leading questions. He contends that the single-witness policy undermines the grand jury process, prevents the grand jurors from evaluating the credibility of witnesses and the strength of evidence, and shields the government's trial witnesses from cross examination based on their grand jury testimony.

The government admits to a policy of using a single witness before the grand jury in narcotics cases where the defendant is already under arrest. According to the government, the practice is simply an efficient and effective means of obtaining indictments within the required ten days of arrest, particularly because the Narcotics Special Grand Jury meets only twice a week. Thus, the government explains, the practice of presenting evidence through a single witness, usually the case agent, pro-

vides the best information quickly and accurately to the grand jury.

As to Carhuapoma in particular, the government admits that it presented only hearsay evidence to the grand jury. It explains that the case agent was unavailable to testify at the scheduled time, so another agent, who had worked on the case and had some direct knowledge of Salcedo's participation, was used; that the grand jurors were warned, directly prior to the agent's testimony about Carhuapoma, that his testimony was hearsay; that the agent never represented to the grand jury that he had personal knowledge of Carhuapoma's conduct; and that the prosecutor reminded the grand jury that it could bring in eye witnesses if it so desired.

As we see it, there is a great deal to criticize in the government's handling of this grand jury proceeding. The single-witness policy routinely relies on hearsay, producing " 'evidence' which appears smooth, well integrated and consistent", making even weak cases appear strong. *United States v. Arcuri*, 282 F.Supp. 347, 349 (E.D.N.Y.), *aff'd*, 405 F.2d 691 (2d Cir. 1968), *cert. denied*, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969). It also "prevents the defendant from utilizing grand jury testimony in cross-examining witnesses who will testify at trial". *Id.* at 349–50.

Moreover, contrary to the government's own standard practice, it was not the case agent who testified before this grand jury. The agent who did testify had little personal knowledge of the actions of any of the defendants; no good reason was offered for the case agent's absence; and the case agent could not recall why he did not testify. In addition, the prosecutor presented many of the details of the case in the form of leading questions, while the testifying agent merely confirmed those details by answering "yes". Furthermore, prior to presenting the evidence against Carhuapoma, the prosecutor gave questionable instructions to the grand jury: she phrased the hearsay warning about the agent's testimony in the past tense, implying that the forthcoming testimony would not be hearsay; she illustrated the concept of hearsay

with the agent's prior testimony, inadvertently vouching for the prior testimony; and she followed a reminder about the grand jury's right to call eye witnesses with a disclaimer that hearsay evidence was "perfectly appropriate", thus diminishing the importance of direct evidence.

We look with disfavor on all of these shortcomings. "We have previously condemned the casual attitude with respect to the presentation of evidence to a grand jury manifested by the decision * * * to rely on testimony of the law enforcement officer who knew least, rather than subject the other officers * * * to some minor inconvenience." *Estepa*, 471 F.2d at 1135; *see United States v. Arcuri*, 405 F.2d at 694; *see also United States v. Borelli*, 336 F.2d 376, 391–92 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Moreover, leading questions tend to mute one of the chief functions of the grand jury, the evaluation of the strength of the evidence and the credibility of witnesses. And careless instructions, such as those given here, tend to hamper the grand jury's understanding of the importance of evaluating the reliability of the evidence and to discourage it from demanding eye witness testimony.

Such an ill-planned presentation raises concerns that the United States Attorney's Office may again be leaning toward a casual, "anything goes" attitude with respect to grand jury proceedings. Finally, although the single-witness policy provides an efficient means for obtaining indictments in our overcrowded criminal justice system, we must be wary that we do not exalt expedience at the expense of fundamental fairness nor abandon the virtues of the grand jury process to the unreviewed control of the prosecutor.

Despite these failings, however, we cannot conclude at this time either that the single-witness policy constitutes such "systematic and pervasive" prosecutorial misconduct as would undermine fundamental fairness, or that the rights of either defendant were violated before the grand jury. The testifying agent did establish that his testimony about Carhuapoma and Salcedo

was derived from conversations with other agents and from a review of the case file; the prosecutor did warn the grand jurors, however clumsily, about the hearsay nature of the agent's testimony; and most importantly, the agent's testimony to the grand jury was concededly accurate. Thus, we cannot say that the grand jury was misinformed or misled in this case, or that there was prejudice to the defendants, who were convicted after a full and fair trial. We therefore—not with great enthusiasm—decline to exercise our supervisory power in this case.

### B. Salcedo's Other Claims

#### 1. *Sufficiency of the evidence.*

■ Salcedo's claim that the evidence was insufficient to support his conviction on either the conspiracy charge or the substantive count is easily dispatched.

Miguel testified that Salcedo was present when Brito gave Eddie a sample of the cocaine; that during their meeting, Brito introduced Salcedo as his partner and discussed the details of the transaction in Salcedo's presence; that Brito sent Salcedo to his apartment to get the cocaine; and that Salcedo said he wanted "no guns, no problems" during the transaction. Moreover, Brito's wife testified that Salcedo was in the apartment when the cocaine was delivered and that he told her to throw it out the window when the agents arrived at the door. From this evidence, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

#### 2. *"Locking in" a witness's testimony.*

■ Salcedo also claims that the government improperly called Brito's wife, Lordes Cabrera, to testify before a second grand jury solely to "lock in" her testimony for trial. The government responds that she testified in relation to an on-going investigation involving unidentified coconspirators and the possibility of forfeiture of Brito's property.

It is, of course, improper for the government to use grand jury testimony for the primary purpose of preparing another case for trial. *See United States v. Fisher,* 455 F.2d 1101, 1104–05 (2d Cir.1972). However, the government's claim that the reason for Cabrera's testimony was to obtain related indictments is reasonable. *United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.) (grand jury proceeding into related charges does not constitute improper use of grand jury, even if it also "locks in" testimony), *cert. denied,* 379 U.S. 845, 85 S.Ct. 51, 13 L.Ed.2d 50 (1964). We conclude that the government did nothing improper.

#### 3. *The conscious avoidance charge.*

■ Salcedo challenges the conscious avoidance charge given to the jury. A conscious avoidance charge is appropriate when the defendant claims a lack of knowledge of the relevant acts, but the surrounding circumstances would permit a reasonable juror to conclude that the defendant should have known about them. *United States v. Mang Sun Wong,* 884 F.2d 1537, 1541 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990); *United States v. Lanza,* 790 F.2d 1015, 1022 (2d Cir.), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). Salcedo claimed at trial that he was merely delivering mattresses with Brito and that he never knew of the cocaine deal or of the drugs in the apartment; but he concedes that he suspected Brito was up to something. Where, as here, a defendant claims he was innocently accompanying a friend who was selling drugs, but that he had no knowledge of the drug deal because he remained on the periphery of the transaction, a conscious avoidance charge is proper. *See, e.g., Mang Sun Wong,* 884 F.2d at 1541–43; *United States v. Dozier,* 522 F.2d 224, 226–27 (2d Cir.), *cert. denied,* 423 U.S. 1021, 96 S.Ct. 461, 46 L.Ed.2d 394 (1975).

Further, we find no error in the particular conscious avoidance charge used by the court; it tracked the "high probability" and "actual belief" language specifically approved by this court in *United States v. Feroz,* 848 F.2d 359, 361 (2d Cir.1988) and in *Lanza,* 790 F.2d at 1023–24 & n. 2.

We find no merit in Salcedo's remaining claims.

CONCLUSION

The judgments of conviction are affirmed.