**UNITED STATES of America**

v.

**Jose PERALTA and Jesus Ramos, Defendants.**

**No. 90 Crim. 702 (MJL).**

United States District Court, S.D. New York.

April 30, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. by Milton L. Williams, Jr., Asst. U.S. Atty., New York City, for U.S.

Thomas F.X. Dunn, New York City, for defendant Jose Peralta.

Brian Barrett, New York City, for defendant Jesus Ramos.

## OPINION AND ORDER

LOWE, District Judge.

The defendants, Jose Peralta and Jesus Ramos, were indicted in Count I for possession of a controlled substance with intent to distribute under 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(B), and in Count II for use of a firearm in connection with a drug trafficking offense under 18 U.S.C. §§ 924(c) and 2. On the fifth day of trial, after the jury had been charged but before it had rendered a verdict, the Court dismissed the indictment on motion of the defendants. We write now to reiterate the reasons for our decision.

## BACKGROUND

Trial of this matter began on April 15, 1991. At the close of the government's case on April 16, defendants made two motions, one for a judgment of acquittal under Fed.R.Crim.P. 29(a) and one for dismissal of the indictment on the ground of misuse of the grand jury process by the government.[1] In particular, the latter motion relied upon several alleged inconsistencies, revealed for the first time during trial, between the version of the events surrounding the defendants' arrest given by the arresting officer at trial and the version related to the grand jury by an agent of the United States Bureau of Alcohol Tobacco and Firearms ("ATF"), who, although not involved in the arrest, was the sole witness presented to the grand jury.

With the consent of the parties, the Court reserved its decision on defendants' motions until the close of their case, which occurred on the morning of April 17. At that time, but before closing arguments, the government produced to the Court *in camera* a partial transcript ("Testimony Transcript") of grand jury proceedings on October 19, 1990, consisting of the testimony of the ATF officer, Special Agent Robert Cuccinelli. Special Agent Cuccinelli's testimony was comprised entirely of hearsay, derived from one brief conversation on the day of the defendants' arrest with the arresting officer, Detective David Caggiano of the New York Police Department's Bronx Narcotics Division, and from the Agent's review of "paperwork" prepared by Detective Caggiano. Testimony Transcript at 4.[2]

Our review of the transcript found it to support defendants' allegation that Special Agent Cuccinelli's testimony before the grand jury as to what Detective Caggiano had told him about the circumstances surrounding the defendants' arrest was different in several instances from Detective Caggiano's own testimony at trial.[3] Fur-

1. Defendants styled the motion to dismiss the indictments as one "in the nature of a Rule 29 motion."

2. Special Agent Cuccinelli told the grand jury that his testimony was based upon "conversations" with Detective Caggiano and his review of the Detective's "paperwork". Testimony Transcript at 4–5. The Assistant United States Attorney conducting the grand jury proceeding repeated this claim in giving the required warning about hearsay testimony (*see United States v. Estepa*, 471 F.2d 1132 (2d Cir.1972)). Testimony Transcript at 6. In fact, Special Agent Cuccinelli admitted at trial that he had only one brief conversation with the Detective, who was busy doing other things at the time. The "paperwork" he reviewed consisted of a standard one-page "booking sheet" prepared by Detective Caggiano, and his "daily activities report". A number of apparent inaccuracies in these documents were brought out by the defendants at trial.

3. Detective Caggiano testified that he and three other narcotics officers, dressed in plainclothes, entered an apartment building at 80 W. 170th Street in the Bronx and ascended to the second (or "A") floor, where they observed defendant Peralta walking toward them from the direction of Apartment A–8. Upon seeing the officers, Peralta allegedly dropped a plastic bag he was carrying and ran to Apartment A–8. Detective Caggiano testified that he and two of the other officers pursued Peralta into the apartment, where Caggiano saw a desk on which lay two other plastic bags, an electronic scale, several pieces of tin foil and $336 in cash. All three plastic bags were later found to contain "crack" cocaine. Detective Caggiano also testified that

ther, Detective Caggiano had insisted at trial that his testimony was identical to the version of events he had given to Special Agent Cuccinelli on the day of the arrest.

A hearing was then held on defendants' motions. While acknowledging the inconsistencies between the testimony of the two officers, the government argued that the discrepancies did not warrant dismissal of the indictment. Even if Special Agent Cuccinelli's grand jury testimony was inaccurate, the government contended, the inaccuracies were of detail and not of material fact. Thus, the government argued, the reliance on hearsay testimony before the grand jury did not result in prejudice to the defendants.[4] Defendants countered that the potential for prejudice could be inferred from, *inter alia,* the fact that the grand jury requested that Special Agent Cuccinelli be returned to the grand jury room four times for further questioning. This implied, defendants argued, that the grand jury was concerned about the quality of the evidence before it—the very danger inherent in the government's practice of relying exclusively on hearsay testimony in such circumstances.

The issue to be resolved thus became the degree to which the grand jury was genuinely troubled by the prospect of returning an indictment solely on the basis of Special Agent Cuccinelli's hearsay testimony. Defendants sought an order to have transcribed the previously absent portions of the grand jury minutes, those containing the colloquies between the grand jury and the Assistant United States Attorney in the absence of the witness. After ordering that the transcripts be produced, the Court further reserved its decision on defendants' motions, in the interest of judicial economy and again with the consent of the parties.

Closing arguments took place on April 18, and the jury was charged on the morning of April 19. That same morning, shortly before charging was to commence, the government produced a partial transcript that included four colloquies between the grand jury and the Assistant United States Attorney ("Colloquy Transcript").[5] This transcript did not include a further colloquy, approximately twenty minutes in length, that occurred before Special Agent Cuccinelli was called for the first time.[6]

The Court proceeded to charge the trial jury, which began its deliberations. Our *in camera* review of the Colloquy Transcript, however, revealed a new and unforeseen problem in the grand jury proceedings. During the first of the four transcribed colloquies, the following exchange took

in one of the desk drawers, which was open, the officers found a .38 caliber pistol. Finally, the Detective testified that when he entered the apartment, both defendants were standing three or more feet from the desk.

Special Agent Cuccinelli, on the other hand, testified before the grand jury that the officers first encountered Peralta in the lobby on the ground floor at 80 W. 170th Street. Testimony Transcript at 7. More significantly, the Agent also testified that when the officers entered Apartment A–8, both defendants were seated at the desk where the contraband was found. Testimony Transcript at 8 ("[When he entered the apartment, Detective Caggiano] saw defendant Peralta and defendant Ramos sitting behind a desk"). Later, in response to the question "What else did Detective Caggiano observe when he entered the apartment?" Special Agent Cuccinelli said, "Ramos was sitting behind the desk at that time." Testimony Transcript at 9. When examined by defense counsel at trial, the Agent claimed to have intended that only defendant Ramos was seated at the desk. However, we think it is at least as likely that the grand jury interpreted his testimony as placing Peralta there as well.

4. Prejudice has been defined in this context as "a high probability that, if eyewitness rather than hearsay testimony had been used, the defendant would not have been indicted." *United States v. Diaz,* 922 F.2d 998, 1005–1006 (2d Cir. 1990) (quoting *United States v. Dyman,* 739 F.2d 762 (2d Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 969, 83 L.Ed.2d 973 (1985)).

5. According to the transcripts produced, the entire presentation to the grand jury lasted about an hour, beginning at 10:00 a.m. and ending at 11:02. The first of the four transcribed colloquies occurred between 10:30 and 10:35. Colloquy Transcript at 2–8. The second occurred between 10:43 and 10:45. *Id.* at 10–13. The third occurred between 10:50 and 10:55. *Id.* at 14–18. The fourth occurred between 10:56 and 11:02. *Id.* at 19–24.

6. The missing initial colloquy apparently occurred between 10:00 and 10:20 a.m. *See* Testimony Transcript at 1.

place between one or more grand jurors and the government:

> **A Juror:** Was the apartment the legal residence of either of these defendants? And the second question was were any fingerprints taken from the gun that was recovered?
>
> **[Assistant]:** I will ask that question—on the fingerprint question, I think it was constructive possession, okay.
>
> You have heard the testimony at the time Detective [Caggiano] made his observation, no one actually possessed the gun. *The government is proceeding on the theory of both individuals being able to exercise some minimum—in other words, they exercise[d] control or they had access to the gun. They would be able—it was readily available for them to grab it or hold [it]. That is constructive possession. Their [sic] official words are "exercising dominion and control".*
>
> **A Juror:** Did anyone have a license for the gun? Was it licensed?
>
> **[Assistant]:** Do you want me to go get him or do you want to go get him?

Colloquy Transcript at 7–8 (emphasis added). Later, during the fourth colloquy, the following exchange took place:

> **A Juror:** Again, one thing is bothering me. I know you went through it. Did he use and carry—[no,] the gun wasn't used or carried, but he had the opportunity to carry it and fire it?
>
> **[Assistant]:** It is charged to both individuals in this case.
>
> **A Juror:** But this is proper even though the gun was never carried?
>
> **A Juror:** Why don't you read the section again.
>
> **A Juror:** I understand the concept of availability, but did he use—
>
> **[Assistant]:** And Section 924(c), subdivision (1)—let me say that again. Section 924(c) of Title 18, subsection (c), subdivision (1), reads as follows:
>
> "[Whoever], during and in relation to any crime of violence or drug trafficking crime for which he may be prosecuted in a court of the United States, uses or carries a firearm."
>
> Okay. "uses or carries a firearm." The definition of "use", so to speak, in this particular matter, that would be the idea of "carry" again. *I am instructing you to constructive possession—whether or not the firearm in this particular case, a .38 caliber, was accessible to them; whether or not these two individuals exercised any type of dominion or control over it.*
>
> I can't draw that conclusion for you. The only thing you can do is based on the circumstances, you would have to draw it for yourself whether or not they used and carried it.
>
> The definition of "used" in this particular case, it is up to you—"use" can mean, well, they actually pick[ed] it up or *it was actually there readily available to be used or carried.*
>
> Again, it comes back to the term, the idea of constructive possession. Is everyone clear on that? Because the question has come up two times. It is the key of constructive possession.
>
> No one actually possessed it in this case. No one actually picked it up, fired it, used it, pointed it. It was *the idea they had dominion and control—that could fit under the idea of exercising dominion or control.*
>
> **A Juror:** "Use" in the broader sense rather than "uses"?
>
> **[Assistant]:** In other words, there is, it's *available to use.* It was operating. The idea also, there was—if you look at the facts as they were testified to you through Agent Cuccinelli, based on the information [he] received from Detective Caggiano, you have Detective Caggiano indicated to Agent Cuccinelli he saw drugs, a scale, money, and there was a gun in an open drawer.
>
> It is up to you. From those circumstances it is up to you whether those guys were using and carrying that gun in connection with drug trafficking. I can't make that conclusion for you based on the circumstances. As to the gun, it is as to whether or not it was used and carried in connection with drug trafficking. That is something you have to draw

the inference from, but "use and carry" apply with respect to the totality of the circumstances, and the idea of constructive possession applies in this particular case.

**A Juror:** Can you substitute the words in the indictment, "with the intent to use"?

**[Assistant]:** I can't change the statutory language, so to speak. I am required in the indictment to plead based on what the statute says.

**A Juror:** Use in their work, which was distributing narcotics.

**[Assistant]:** That would be—that is the theory under which the government is proceeding. Again, the idea of constructive possession, it has to apply here because you didn't hear any testimony of actually possessing it.

**A Juror:** They were using it in their work, in their profession.

**[Assistant]:** That is a theory that the government is a[d]vancing in this case, exactly. Now, it is up to you. I want to be clear, I am your legal advisor. I am—you have to determine whether or not they were using or carrying the gun in connection with the drug trafficking, not from me, but based on the facts that you heard. So I will leave this copy of the proposed indictment to you....

Colloquy Transcript at 19–24 (emphasis added).

After reviewing the transcript and while the jury was deliberating, the Court held a further hearing on defendants' motions. The government conceded that the above-quoted excerpts almost certainly represented the only explanation of the legal concept of constructive possession given to the grand jury in this case.[7] As explained below, we found that the government's instructions on this issue of law were erroneous and misleading, and that together with the government's reliance on inaccurate hearsay testimony the instructions resulted in prejudice to the defendants before the grand jury.

At the second hearing, as noted below, the government insisted it had proceeded at all times under a constructive possession theory as to both defendants and all of the contraband. It thus made an application to have our ruling on this issue applied to both defendants and both counts of the indictment. The application came during a discussion of whether the Court's concern with the instructions on constructive possession would warrant delaying our ruling on defendants' motion to dismiss until the government could obtain the transcript of the missing initial colloquy with the grand jury:

**The Court:** ... If those minutes are in the possession and control of your office, and your office cannot deliver them to me so that I can make [a] determination prior to this jury rendering its verdict ... what in that situation is the fair thing to do? That's all I'm asking.

**Mr. Williams:** Well, your Honor, obviously the fair thing to do is dismiss the indictment, because every presumption goes with the defendant, they get the benefit of the doubt.

**The Court:** I disagree with you, dismissing the indictment is not the answer. We're not talking about dismissing the indictment, we're talking about dismissing Count Two of the indictment.

**Mr. Williams:** Well, your Honor, the fact of the matter is, constructive possession is also part of Count One as well in terms of defendant Peralta. Because we're charging him with constructive possession of the drugs that were on the desk. So it really obliterates the government's case as to—at least as to defendant Peralta, and actually as to defendant Ramos, because the possession by defendant Ramos at the desk was also a constructive one. So if you rule that way, essentially, the government has no case.

7. *See* Transcript of 4/19/91 Hearing at 4–8. However, the government argued, *inter alia,* that the Assistant United States Attorney's instructions on the statutory elements, which allegedly occurred during the missing initial colloquy, included an instruction that it had to find probable cause that the defendants knowingly and intentionally possessed the contraband items. We address this argument below.

*Id.* at 27–28. The government reiterated this position several minutes later:

> **The Court:** Let me ask you, Mr. Williams, are you saying that the government's theory as to both of these defendants on Count One was constructive possession?
>
> **Mr. Williams:** Yes, it had to be, your Honor, even if Mr. Ramos was seated behind the desk he didn't actually have his hands on it or in his pockets, it was in front of him. It was what we call a strong constructive possession case. Both theories are under constructive possession, your Honor.
>
> **The Court:** As to both defendants?
>
> **Mr. Williams:** That's correct. That is the government's theory.

*Id.* at 36. We granted the government's application and defendants' motion, and dismissed the indictment.

## DISCUSSION

### A. Constructive Possession

Both before the grand jury and at trial in this case, the government relied upon a theory that each of the defendants possessed, not actually but constructively, both the gun found in the desk in the apartment where defendants were arrested and the three plastic bags found to contain "crack" cocaine. Indeed, although the evidence at trial may well have been sufficient to support a theory of *actual* possession as to at least defendant Peralta and one of the bags, the government insisted at the second hearing on defendants' motion to dismiss that constructive possession had been the lynchpin to its entire case against both defendants. Thus, the grand jury's understanding of the (somewhat counterintuitive) concept of constructive possession was extremely important.

An Assistant United States Attorney plays multiple roles before a grand jury. He or she "calls and examines witnesses, presents documents, explains the law, sums up the evidence, and requests an indictment." *United States v. Kleen Laundry & Cleaners, Inc.*, 381 F.Supp. 519, 521 (S.D.N.Y.1974). We hold that the Assistant United States Attorney's instructions to the grand jury on constructive possession in this case seriously misstated the applicable law.[8] As one court has explained,

> Possession may be either actual or constructive.... Actual possession exists when a tangible object is in the immediate possession or control of the party. Constructive possession exists when a person *does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over [the] object....*

*United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir.) (emphasis added), *cert. denied*, 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973), *quoted in United States v. Rivera*, 844 F.2d 916, 925 (2d Cir.1988), *and in United States v. Tribunella*, 749 F.2d 104, 111–12 (2d Cir.1984). At no point in his colloquies with the grand jury in this case does it appear that the Assistant United States Attorney distinguished between actual and constructive possession in any coherent fashion. He clearly failed to instruct the grand jury that it had to find probable cause that each of the defendants "*knowingly* [had] the power *and the intention* ... to exercise dominion and control" over the firearm and the drugs. Indeed, we find no mention whatsoever of the elements of knowledge and intent as they apply to constructive possession.[9]

8. Although the questions raised by the grand jurors related to possession of the firearm, since the government admittedly relied on a constructive possession theory as to the drugs as well we find that the erroneous instructions raise grave doubts as to the entire indictment.

9. We are not persuaded by the government's argument that, by initially instructing the grand jury about the general function of knowledge and intent in a criminal case, it obviated the need to provide a proper explanation of constructive possession. Even if this were true, however, we find that the misleading instructions given in response to the jurors' questions nullified any impact such correct earlier advice might have had. Nor do we find, as the government argued, that the references to "dominion and control" (twice described as "dominion *or* control") were sufficient to convey the required meaning. The grand jury's repeated questions

Nor did the Assistant merely fail to instruct the grand jury on a question of applicable law. Rather, he relied on the following misleading statements of the meaning of constructive possession:

> [1] ... being able to exercise some minimum—in other words, they exercise[d] control or they had access to the gun. They would be able—it was readily available for them to grab it or hold [it]. The[ ] official words are "exercising dominion and control";
>
> [2] ... accessible to them; whether or not these two individuals exercised any type of dominion or control over it;
>
> [3] actually there readily available to be used or carried;
>
> [4] the idea they had dominion and control—that could fit under the idea of exercising dominion or control;
>
> [5] available to use.

Unlike the concept of actual possession, constructive possession is a legal fiction that frequently runs counter to a layperson's understanding of what it means to "possess" something. We conclude that there was a high probability, if not a certainty, that the grand jury in this case was misled into thinking that constructive possession was equivalent to the mere *physical possibility* of exercising dominion and control over the gun and the drugs. In other words, it is entirely possible that the grand jury concluded, improperly, that "mere proximity" would be sufficient to constitute possession as it pertained to the offenses charged.[10]

B. Reliance on Hearsay Testimony

The potential prejudice to the defendants caused by the misleading explanations of the law of constructive possession was compounded by the recurring problem of the government's reliance on hearsay testimony before grand juries. As recently as last year, in *United States v. Brito*, 907 F.2d 392 (2d Cir.1990), the Court of Appeals reiterated its longstanding concern with the government's practice of using a "case agent" before a grand jury in place of eyewitnesses, a practice which

> produc[es] " 'evidence' which appears smooth, well integrated and consistent," making even weak cases appear strong, ... [and] "prevents the defendant from utilizing grand jury testimony in cross-examining witnesses who will testify at trial"

and thus threatens the independence of the grand jury function.[11] *Id.* at 395 (quoting

indicate that it felt its understanding of what sort of "possession" was involved in this case was far from clear. See, for example, the juror's question about the possibility of amending the indictment, and the Assistant's response, quoted at page 8 above. Indeed, the *trial* jury was apparently troubled by exactly the same issue; as the Court was announcing its decision on defendants' motion to dismiss the indictment, it received a note from the jury asking for a second explanation of the difference between actual and constructive possession. *See* Transcript of 4/19/91 Hearing at 35.

**10.** *See United States v. Rivera, supra,* 844 F.2d at 925; *United States v. Tribunella, supra,* 749 F.2d at 112 ("mere proximity" insufficient to establish constructive possession in a criminal case). *Cf. United States v. Hastings,* 918 F.2d 369, 371 (2d Cir.1990) ("The district court erred [in instructing the jury] in not requiring power *and* intention to control the firearm as elements of 'constructive' possession") (citations omitted, emphasis in original).

*United States v. Beech-Nut Nutrition Corp.,* 659 F.Supp. 1487 (E.D.N.Y.1987), in which the court declined to dismiss an indictment on the ground, *inter alia,* that the prosecutor had improperly instructed the grand jury on a question of law, does not persuade us to reach a different conclusion here. Of the two cases relied on by the *Beech-Nut* court, *United States v. DePalma,* 461 F.Supp. 778 (S.D.N.Y.1978), addressed a claim that the government had erred in not presenting the law as to certain potential affirmative defenses to the grand jury. *See id.* at 796–97. Similarly, the alleged erroneous instruction in *United States v. Buchanan,* 787 F.2d 477 (10th Cir.1986), *cert. denied,* — U.S. —, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990), was less clearly prejudicial than the one at issue here. *See id.* at 487. For its part, the *Beech-Nut* decision does not discuss the nature of the allegedly erroneous instruction at issue there. *See* 659 F.Supp. at 1499. None of these decisions permits a prosecutor to mislead a grand jury as to what elements it must find in order to return an indictment for possession of contraband. Nor was the problem of improper instruction in these cases compounded by reliance on inaccurate hearsay testimony, as here.

**11.** On the issue of protecting eyewitnesses from cross-examination with prior statements, the government argued here that defendants achieved the same result on their cross-exami-

*United States v. Arcuri,* 282 F.Supp. 347, 349–50 (E.D.N.Y.), *aff'd,* 405 F.2d 691 (2d Cir.1968), *cert. denied,* 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969)). More seriously, the practice is indicative of an unduly "casual attitude with respect to the presentation of evidence to a grand jury." *United States v. Estepa,* 471 F.2d 1132, 1135 (2d Cir.1972).

Although the Court in *Brito* declined, "not with great enthusiasm," to dismiss the challenged indictment, it did so only after finding, "most importantly, [that] the agent's testimony to the grand jury was concededly accurate." 907 F.2d at 396. Here, by contrast, Special Agent Cuccinelli's testimony was concededly *inaccurate:* his descriptions to the grand jury of where Detective Caggiano first confronted defendant Peralta, and, more importantly, of where the defendants were standing in the room where the second confrontation occurred, were plainly contradicted by Detective Caggiano's testimony at trial.

### C. Dismissal of the Indictment

We find that defendants were seriously prejudiced by the cumulative effect of the government's misleading statements of law and its use of inaccurate hearsay testimony. *Cf. United States v. Hogan,* 712 F.2d 757, 761–62 (2d Cir.1983) (dismissing indictment based on government's reliance on "false and misleading" hearsay testimony). These defects in the grand jury presentation leave us with "grave doubt that the decision to indict was free from the substantial influence" of the errors. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988).

Under such circumstances, it was within our supervisory authority to dismiss the indictment against the defendants. In *United States v. Vetere,* 663 F.Supp. 381 (S.D.N.Y.1987), the Court found that the combination of hearsay testimony, which contained factual errors about the offense and about the defendant's background,[12] the presentation of non-relevant, highly prejudicial, and erroneous information about the defendant's criminal record, and possibly erroneous and misleading instructions on the law, amounted to "prosecutorial impairment of the grand jury's independent role," *United States v. Hogan, supra,* 712 F.2d at 761, warranting dismissal of the indictment even after the trial jury had returned a verdict of guilty. We consider the errors in the present case, which went both to the quality of the evidence before the grand jury and to the requirements of the legal theory at the core of the government's case, to have been every bit as serious as those present in *Vetere.*

### CONCLUSION

For the reasons stated above, we granted the government's application that our ruling on the issue of its instructions to the grand jury be applied to both defendants and both counts of the indictment in this case, and we granted defendants' motion to dismiss the indictment.

---

nation of Detective Caggiano by showing him the grand jury testimony of Special Agent Cuccinelli and asking whether it refreshed his recollection as to what he told the agent at the time of the arrest. We disagree.

**12.** We note that in considering the prejudice caused by the inaccurate hearsay testimony, the *Vetere* Court considered it relevant that the grand jury, similarly to the one here, had recalled the case agent five times for further questioning. 663 F.Supp. at 384. The Court also aptly observed,

Although there is no indication that the government was deliberately proceeding by proffering erroneous information, it was, of course, the government's choice to proceed through hearsay, despite repeated admonitions from the Circuit to avoid it ... and the consideration by the grand jury of the mistaken information must consequently be laid at the government's doorstep in the absence of any showing of the unavailability of the complaining witness.

*Id.* (citing *United States v. Hogan, supra; United States v. Estepa, supra* ).