UNITED STATES of America,
Plaintiff-Appellee,

v.

Lawrence A. HOGAN and Leonard J.
Patricelli, Defendants-Appellants.

Nos. 881, 882, Dockets 82–1243, 82–1287.

United States Court of Appeals,
Second Circuit.

Argued Feb. 7, 1983.

Decided June 28, 1983.

As Amended Sept. 12, 1983.

David S. Golub, Stamford, Conn. (Leora Herrmann, Susann E. Gill, Silver, Golub & Sandak, Stamford, Conn., of counsel), for defendant-appellant Hogan.

John R. Williams, New Haven, Conn. (Williams & Wise, New Haven, Conn.), for defendant-appellant Patricelli.

Jeremiah F. Donovan, Asst. U.S. Atty., New Haven, Conn. (Alan H. Nevas, U.S. Atty. for the Dist. of Conn., New Haven, Conn., of counsel), for plaintiff-appellee.

Before LUMBARD and CARDAMONE, Circuit Judges, and ZAMPANO, District Judge.*

CARDAMONE, Circuit Judge:

On this appeal our principal concern is directed not at the jury trial where the accused were found guilty, but at earlier events—those that transpired before the grand jury which indicted the appellants. More than in other cases, the minutes of the grand jury proceedings in this case reveal what can happen when the prosecutor is too determined to obtain an indictment. The

---

* Honorable Robert C. Zampano, Judge of the United States District Court for the District of Connecticut, sitting by designation.

temptations to cut corners, to ignore the rights of an accused, and to toss fair play to the winds gain ascendancy. Prosecutors presenting cases to grand juries are firmly subject to due process limitations and bound by ethical considerations. While we fully recognize that a court's power to dismiss an indictment following a conviction at trial rarely is exercised, the prosecution so violated these limitations and obligations as to mandate this indictment's dismissal. Here prosecutorial zeal only illuminates anew the insight of the old adage that the ends cannot justify the means.

## I

On July 24, 1981 appellants, Lawrence A. Hogan and Leonard J. Patricelli, were indicted by a grand jury sitting in the District of Connecticut for conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. § 846. Hogan was also charged with five counts of using a telephone to facilitate an attempt to possess with intent to distribute heroin, in violation of 21 U.S.C. § 843(b). One of the § 843(b) counts was dismissed prior to trial.

After a nine-day trial held before then Chief Judge T. Emmet Clarie and a jury in the United States District Court for the District of Connecticut, the jury returned guilty verdicts as to both appellants on the conspiracy count and as to Hogan alone on three of the telephone facilitation counts, acquitting him on the remaining one. Although the appellants had moved before trial to dismiss the indictment on the basis of prosecutorial misconduct before the grand jury, that motion was denied. Both appellants were sentenced to five-year terms for the conspiracy conviction. Hogan also received three one-year terms on the telephone facilitation convictions, all of his sentences to run concurrently.

This case arose from a Federal Drug Enforcement Administration (DEA) undercover investigation of Hogan, a retired Stamford Connecticut Police Lieutenant with 22 years service, who had formerly served as head of the Southwestern Connecticut Regional Narcotics Crime Squad, and Patricel-

li, an associate of Hogan's with alleged ties to organized crime. Playing a central role in this investigation was Martin "Yogi" Ruggieri, a businessman who had allegedly borrowed $20,000 from Hogan. The record discloses that in late January 1981 Yogi persuaded Hogan and Patricelli to travel to the Hilton Hotel in Rye, New York for the purpose of obtaining repayment of the debt. While the government contends that the contemplated medium of repayment was narcotics, appellants assert that it was cash. In any event, upon arriving at the Hilton, Hogan and Patricelli were stopped by Rye Police Detective John Carlucci who was acting upon a request he had received from the DEA. Carlucci told Hogan and Patricelli that DEA agents were investigating a narcotics transaction and requested appellants to accompany him to Rye police headquarters for questioning. When it became clear at police headquarters that there was no basis to hold appellants, they were permitted to leave. We will return to this incident later.

On February 4, 1981 Yogi informed DEA Agent Paul Salute that Patricelli wanted to meet Yogi that evening to discuss the Rye, New York incident and Yogi's loan. Agent Salute, posing as Yogi's cousin from New Jersey, called Patricelli and had that meeting postponed. In the ensuing weeks a series of four meetings were held. At the first meeting, on February 11, Yogi, Hogan and DEA Agent Alleva, posing as a business partner of Yogi's cousin, met to discuss the money Yogi owed Hogan. During this meeting Alleva offered to sell to Hogan heroin at a discount price in exchange for forgiveness of Yogi's debt. The other meetings, between Hogan, Alleva, and on two occasions Patricelli, occurred on February 19, March 2 and March 11 at various area bars and restaurants. A number of telephone calls (perhaps nine or ten) between Hogan and Alleva also were made during February and March. The subject of these meetings and telephone calls concerned the proposed drug deal.

Through February and early March plans to implement the deal were in the discus-

sion stage. No drugs were ever actually obtained or distributed. Then on March 13, when Alleva called him, Hogan terminated his involvement in the scheme, stating that he did not believe in it. In response to this statement by the principal subject of the undercover investigation, Alleva threatened Hogan with bodily harm if he did not change his mind and go through with the deal. DEA agents equipped Yogi with a recording device and sent him to see Hogan on May 12 to find out what had happened. Hogan told Yogi that he could not get involved in distributing heroin because it was against everything he ever believed in and that he wanted nothing to do with Alleva. Shortly thereafter the government sought and obtained the indictments at issue in this case.

## II

Before examining the grand jury proceedings, we review the functions of that body and the rules which govern the conduct of a prosecutor in making a grand jury presentation. The grand jury convenes as a body of lay persons acting in secret, unfettered by technical rules of procedure or evidence. *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). Charged to indict no one on account of prejudice or to refuse to indict anyone as a special favor, this bulwark against Star Chamber proceedings in England was believed so essential to basic liberties that it was incorporated in the Fifth Amendment to the United States Constitution. *See id.* That Amendment commands that "[n]o person shall be held to answer a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."

Interposing a grand jury between the individual and the government serves the intended purpose of limiting indictments for higher crimes to those offenses charged by a group of one's fellow citizens acting independently of the prosecution and the court. *See Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). In this independent position, a grand jury performs two distinct roles. It serves as an accuser sworn to investigate and present for trial persons suspected of wrongdoing. At the same time—and equally important—it functions as a shield, standing between the accuser and the accused, protecting the individual citizen against oppressive and unfounded government prosecution. *See United States v. Calandra,* 414 U.S. 338, 342–43, 94 S.Ct. 613, 617–618, 38 L.Ed.2d 561 (1974); *Branzburg v. Hayes,* 408 U.S. 665, 686–87, 92 S.Ct. 2646, 2659–2660, 33 L.Ed.2d 626 (1972).

█ It is true of course that prosecutors, by virtue of their position, have gained such influence over grand juries that these bodies' historic independence has been eroded. 8 R. Cipes, J. Hall, M. Waxner, *Moore's Federal Practice* ¶ 6.02[1] at 6–19—6–23 (2d ed. 1982). After all, it is the prosecutor who draws up the indictment, calls and examines the grand jury witnesses, advises the grand jury as to the law, and is in constant attendance during its proceedings. Nonetheless, there remain certain limitations on the presentation that a prosecutor may make to the grand jury. *See, e.g., United States v. Ciambrone,* 601 F.2d 616, 623 (2d Cir.1979) (prosecutor may not mislead grand jury or engage in fundamentally unfair tactics before it). In fact the gain in prosecutors' influence over grand juries is all the more reason to insist that these limitations be observed strictly. Due process considerations prohibit the government from obtaining an indictment based on known perjured testimony. *See United States v. Basurto,* 497 F.2d 781, 785 (9th Cir.1974). Courts have also held that a prosecutor may not make statements or argue in a manner calculated to inflame the grand jury unfairly against an accused. *See, e.g., United States v. Serubo,* 604 F.2d 807, 818 (3d Cir.1979). Under the applicable guidelines prosecutors have an ethical obligation strictly to observe the status of the grand jury as an independent legal body. *See* American Bar Association, *Standards For Criminal Justice* Standard 3–3.5 at 3.48 (2d ed. 1980); *United States Attorney's Manual* 9–11.015 (August 17, 1978).

In short, a prosecutor as an officer of the court is sworn to ensure that justice is done, not simply to obtain an indictment.

## III

Bearing in mind these general obligations, we turn to the specific instances of prosecutorial misconduct which occurred before the grand jury in this case. At one point during the proceedings, a grand juror, apparently troubled by the proposed prosecution, posed the following question to the Assistant United States Attorney (AUSA):

What I don't understand is if this case fell through, in other words, if there was no deal made what is the purpose of us listening to this?

The AUSA's response, in pertinent part, was as follows:

If the deal would have gone forward we would have had a real hoodlum trying to sell heroin. . . . I think even though in a general case where somebody backs out and decides not to do the crime it probably shouldn't be prosecuted.

In a case like this I think is [sic] a matter of equity it should.

Having characterized Hogan as a real hoodlum, who should be indicted as "a matter of equity," the AUSA proceeded to present to the grand jury hearsay testimony to the effect that Connecticut police officials thought that Hogan had committed crimes wholly irrelevant to the alleged drug transaction then under federal investigation. Specifically, the prosecutor introduced testimony that Hogan was a "suspect" in the apparently unrelated murders of a drug dealer named David Avnayim and a Norwalk Connecticut policeman named Charles Dugan. The grand jury was never asked to consider returning indictments for any federal offenses relating to these two murders.

In addition to the testimony regarding the two murders, the AUSA suggested that Hogan was guilty of misconduct while he was a police officer. Making himself an unsworn witness, the prosecutor informed the grand jury that he had read various articles in a Stamford newspaper which accused "a high ranking officer" of receiving bribes from gamblers. Then the same AUSA went on to relate that Leo Tobin, a Stamford police officer, had told him that Stamford Police Chief Czankis had mentioned to Tobin that Hogan was "suspected of having been on the take from gambling establishments."

Further, the prosecutor, faced with explaining Hogan's refusal to go through with the drug deal, elicited the following testimony. In response to a question posed by the prosecutor, Agent Alleva testified that he had no direct knowledge of why Hogan had changed his mind, but that he had "heard why through other agents." The AUSA immediately followed up that question by asking Alleva whether "[t]he speculation is that Yogi told Hogan that this was an undercover deal?" To this Agent Alleva responded affirmatively. The identity of the persons so speculating and the basis for their conclusions were never explored. Moreover, evidence in the DEA's possession in the form of the recording of the May 12 conversation between Hogan and Yogi casts serious doubt on the accuracy of this speculation.

Concerned with the obvious possibility that the grand jury might not indict because no drugs were ever purchased, possessed or distributed, it was apparently the prosecution's view that it would be helpful to show appellants' predisposition to possess heroin; but much of the evidence it presented in this regard later proved to be false. This seems the only plausible explanation for the AUSA having elicited repeated testimony from Agents Salute and Alleva that in January 1981, prior to the proposed narcotics deal in question, Hogan and Patricelli had been caught in Rye, New York attempting to obtain heroin. Agent Salute categorically denied any DEA role in the Rye incident and Agent Alleva testified that he had thoroughly investigated the incident and that the stop of appellants by the Rye police was in no way caused by the DEA. But the facts in the record indicate just the opposite. Confronted with statements of the Rye police and writings made at the time of the stop, Agent Salute admit-

ted in post trial proceedings that the DEA had in fact called the Rye police and *instigated* the detention of Hogan and Patricelli.

Additionally, Agent Salute told the grand jury that he had discussed heroin over the telephone with Patricelli prior to the first meeting with Hogan. This evidence, which tended to show that appellants were arranging a heroin deal even before the first meeting with DEA undercover agents, was later conceded by the government to be untrue. The subject of heroin was not mentioned until the first meeting in February. Similarly, Agent Alleva "mistakenly" testified before the grand jury that he had informed Hogan at the first meeting that Hogan would have to pay $50,000 prior to the heroin delivery. In fact, Hogan was initially offered nearly $2,000,000 worth of heroin for no cash down payment. This offer—one that Hogan admitted had tempted him—differed significantly from the offer Alleva described to the grand jury. At trial Agent Alleva conceded that on this particular point he had made an error. He testified that the $50,000 demand on Hogan was not made at the first meeting, but was in fact made several meetings later. His explanation was that he had "confused" the meetings during his grand jury testimony.

## IV

The law of this Circuit is that dismissal of an indictment is justified to achieve either of two objectives: to eliminate prejudice to a defendant; or, pursuant to our supervisory power, to prevent prosecutorial impairment of the grand jury's independent role. *See United States v. Fields,* 592 F.2d 638, 647 (2d Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). Viewing the above-mentioned instances of conduct cumulatively, *see United States v. Samango,* 607 F.2d 877, 884 (9th Cir.1979); *United States v. Roberts,* 481 F.Supp. 1385, 1389 (C.D.Cal. 1980), we believe that the latter function is implicated here.

Although there is no prohibition on the use of hearsay evidence before a grand jury, our decision in *United States v. Estepa,* 471 F.2d 1132 (2d Cir.1972), indicates that extensive reliance on hearsay testimony is disfavored. More particularly, the government prosecutor, in presenting hearsay evidence to the grand jury, must not deceive the jurors as to the quality of the testimony they hear. *Id.* at 1137. Heavy reliance on secondary evidence is disfavored precisely because it is not first-rate proof. It should not be used without cogent reason, *see* American Bar Association, *Standards For Criminal Justice* Commentary to Standard 3–3.6 at 3.50 (2d ed. 1980), and never be passed off to the grand jurors as quality proof when it is not. *Cf. United States v. Gallo,* 394 F.Supp. 310, 315 (D.Conn.1975) (prosecutor failed to indicate to grand jury quality of hearsay testimony that body was receiving). Here the prosecution presented extensive hearsay and double hearsay speculation regarding Hogan's involvement in two murders, corrupt activities as a policeman, and reason for terminating his participation in the proposed heroin deal. Such secondary evidence added a false aura of factual support to the government's case and may well have deceived the grand jurors.

Additionally, the impartiality and independent nature of the grand jury process was seriously impaired by the AUSA's argument that Hogan was a real hoodlum who should be indicted as a matter of equity. *See Serubo,* 604 F.2d at 818 (uncalled for references to accused's violent tendencies and purported Mafia associations impermissible). Added to this inflammatory rhetoric were the numerous speculative references to other crimes of which Hogan was "suspected." None of these other crimes, the two murders and Hogan's alleged taking of bribes while a policeman, was under investigation by the grand jury. In fact, there is no indication that Hogan has ever been charged with these offenses by any state or federal body. These government accusations and others appear to have been made, not to support additional charges, but in order to depict appellants as bad persons and thereby obtain an indictment for independent crimes. This tactic is "fundamentally unfair," *Ciambrone,* 601 F.2d at 623.

Finally, the DEA agents' false testimony to the grand jury on the issues of predispo-

sition and inducement is most disturbing. Although the government was not required to anticipate a defense of entrapment and introduce evidence of predisposition, having elected to do so it was duty bound not to introduce false and misleading testimony. While the factual misstatements in the agents' testimony may have been inadvertent, as the government now argues, the fact remains that the appellants were prejudiced by the misstatements of important facts and the grand jury's independent role was impaired. *See Samango,* 607 F.2d at 882 ("Although deliberate introduction of perjured testimony is perhaps the most flagrant example of misconduct, other prosecutorial behavior, even if unintentional, can also cause improper influence and usurpation of the grand jury's role." (footnote omitted)); *United States v. Asdrubal-Herrera,* 470 F.Supp. 939, 943 (N.D.Ill.1979). Regardless of the government's intent, we believe that the grand jury was probably misled by this presentation.

In summary, the incidents related are flagrant and unconscionable.[1] Taking advantage of his special position of trust, the AUSA impaired the grand jury's integrity as an independent body. Thus, based on the particular facts of this case, we believe that the indictment below must be dismissed.[2]

1. Further compounding our concern respecting the prosecutor's conduct before the grand jury is the brief submitted by the United States on this appeal. It contains factual misrepresentations, some of which the government does not even bother to defend, and introduces matters wholly irrelevant to the merits. We are left to wonder whether its purpose was to prejudice the appeal before us. Even assuming such was not intended, we nonetheless consider inaccuracies as to facts and needless references to irrelevancies a serious matter of which we disapprove. *See United States v. Jacobson,* 691 F.2d 110, 115–16 (2d Cir.1982).

2. We do not think that the Supreme Court's recent decision in *United States v. Hasting,* —— U.S. ——, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) mandates a different result here. In *Hasting* the Seventh Circuit exercised its supervisory powers and reversed certain convictions in an apparent attempt to discipline prosecutors for what were perceived to be continuing violations of *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1968). Based on the particular facts of that case, the Supreme

Because of the determination reached, we need not decide the numerous other issues raised on appeal.[3] The judgments of conviction are reversed and the case remanded to the district court with instructions to dismiss the underlying indictment against appellants.

Court reversed because the Seventh Circuit had failed to weigh the competing interests involved in the exercise of its supervisory power and had ignored the fact that any error was harmless beyond a reasonable doubt. *See Hasting,* —— U.S. at —— ——, 103 S.Ct. at 1979–1982. The present case, however, does not present the same weighty interests militating against the exercise of supervisory power as were present in *Hasting.* Moreover, we do not believe that any error here was harmless. If not for the clear prejudice resulting from the AUSA's misconduct, appellants might not have been indicted.

3. Among the other issues raised on appeal is whether an accused who withdraws before the commission of an overt act may nonetheless be found guilty of a narcotics-related conspiracy under 21 U.S.C. § 846 (1976). While this question was fully briefed and argued on appeal, we need not resolve it here since we hold that appellants' indictment must be dismissed.