**UNITED STATES of America, Plaintiff,**

v.

**Henry ORJUELA, Defendant.**

**No. CR–91–0055.**

United States District Court,
E.D. New York.

Dec. 18, 1992.

Lawrence D. Gerzog, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

Larry Krantz, Meister, Leventhal & Slade, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

In July of 1991, defendant Henry Orjuela was convicted of one count of conspiring to import five kilograms or more of cocaine. Mr. Orjuela now argues that the government's misconduct in connection with the grand jury proceeding by which he was indicted entitles him to an order dismissing that indictment. In addition, he moves this court, first, to grant him a new trial based on the government's constructive amendment of the indictment and, second, to set aside the jury's verdict based on the absence of sufficient evidence against him at trial. For the following reasons, this court must deny Mr. Orjuela's motions.

## I. MOTION TO DISMISS INDICTMENT

### A. *Grand Jury Proceedings*

Any discussion of defendant Orjuela's first post-trial motion must begin with an examination of the testimony before the grand jury concerning Henry Orjuela's criminal activity. All of the evidence against Orjuela was presented through Special Agent Paul W. Vick, who relied primarily on information from a confidential informant known as "Roberto." Agent Vick informed the grand jurors that Roberto, a previously convicted heroin trafficker (Tr. 37–39), was an informant whose "reliability has been proven and it has resulted in the seizure of cocaine and also a number of arrests have resulted from the cooperation of the informant." (GJM 9)

The "seizure of cocaine" to which Agent Vick referred was a large-scale narcotics importation scheme instituted by Roberto at the instruction of the FBI. Roberto contacted various drug traffickers in Los Angeles and informed them that his organization could transport substantial quantities of cocaine into the United States. (Tr. 39–40) The government confirmed Roberto's credibility by arranging for him to intervene and reduce the sentences of two drug traffickers, Gladys Londono–Ramirez and Luisa Castaneda. (Tr. 40–43) With his reputation thereby enhanced, Roberto was able to come into contact with Jaime Orjuela, Henry Orjuela's brother and one of the four or five largest distributors of cocaine out of Colombia from the Cali cartel. (GJM 7–10) Roberto's cooperation enabled the government to seize approximately 1500 kilograms of cocaine in Guatemala and 500 kilograms in New York; the grand jury was informed that "the sum total that [the government] could produce as evidence would be over 2000 kilos of cocaine." (GJM 16)

Agent Vick provided the following testimony to the grand jury concerning Henry Orjuela's involvement in the cocaine importation scheme:

Q: [D]id the confidential informant have occasion to speak to a man by the name of Henry Orjuela.

A: Yes, he did.

Q: First of all, who's Henry Orjuela.

A: Henry Orjuela is the brother and one of three brothers of Jaimi Orjuela. There are four brothers. All of them are involved in this conspiracy. They all work for—or I should say, Jaimi Orjuela, the only person that's above him in the Cali cartel is a man by the name of Jose SantaCruz Landanio (phonetic) who's one of the heads of the cartel.

Jaimi Orjuela works right under Jose SantaCruz Landanio. Henry Orjuela works directly under Jaimi and manages all of Jaimi's operational affairs. In the summer of 1989, Jaimi Orjuela and a number of other people in Columbia that were being sought after by the Columbian authorities went into hiding.

In Jaimi's absence, Henry assumed control of Jaimi's operations and so, Henry then stepped in and instructed our informant to do certain things.

Q: What I want to do is direct you specifically to some of the conversations between Henry and the informant beginning on August 22, 1989, and here I am referring, specifically, to paragraph eight of Grand Jury Exhibit 1 [the complaint against Mr. Orjuela].

Did the informant have a conversation with Henry Orjuela on that date?

A: Yes, he did. It was a taped conversation.

Q: And have you had an opportunity to review the transcript from that tape?

A: Yes, I have.

Q: Can you tell us, in summary, what that conversation was?

A: Defendant, Henry Orjuela told the informant that defendant—that Jaimi Orjuela was moving from place to place to avoid arrest in Columbia. Henry Orjuela discussed with the informant the financial responsibilities of each of the parties involved in the smuggling operation and methods to insure the security of the cocaine.

Mr. Henry Orjuela advised the informant that he would call a female defendant, Maria Gladys Ramirez Landanio (phonetic), and relay through her a telephone number where Jaimi Orjuela, his brother, could be reached by the informant.

(GJM 11–13) Roberto never met Mr. Orjuela face-to-face; however, Agent Vick recounted a second conversation allegedly between Roberto and Henry Orjuela on November 27, 1992. Neither this conversation nor any of the other conversations described to the grand jury—save that of August 22—were taped. As reported to the grand jury, the November conversation involved defendant Orjuela asking the informant whether the latter had the ability to get five hundred kilograms of cocaine from Mexico into New York. (GJM 13)

Agent Vick also told the grand jury of a conversation about Henry Orjuela between Roberto and someone named Frank, allegedly a top-level manager in the Orjuela organization. (GJM 14–15) More specifically, Frank told Roberto that he was in Aruba with Jaime Orjuela, Henry Orjuela and Gilberto Orjuela and that his group was ready to ship the cocaine to New York during the first week in January. (GJM

15) The final portion of Agent Vick's testimony relating directly to Henry Orjuela described a phone call to Roberto on December 25, 1989 in which Henry Orjuela allegedly told the informant to contact Carlos Orjuela, another brother, at a certain number by December 29th. (GJM 16)

Based on the foregoing information, the grand jury voted to indict Henry Orjuela on January 24, 1991. The indictment charged Mr. Orjuela with knowingly and intentionally conspiring with others between January 1989 and January 1991 to import into the United States from a place outside thereof five kilograms or more of a substance containing cocaine. Trial was scheduled for July of 1991.

Prior to this trial date several events occurred that called into question the grand jury testimony concerning Mr. Orjuela. First, Roberto—upon whose credibility the testimony rested—fled and could not be located.[1] Second, the government learned that Roberto had received $200,000 from some of the targets of the investigation and had not informed the government about that money. Third, based on the testimony of Gladys Londono–Ramirez—a cooperating witness directly involved in the importation transaction—the government learned that some of the information provided to the grand jury was false. Specifically, Ms. Ramirez, who had met both Henry Orjuela and his brother Gilberto, identified the voice in the taped conversation of August 22, 1991 as Gilberto, thereby directly contradicting Roberto. Ms. Ramirez also stated that she did not know whether the cocaine seized in Guatemala was indeed "Orjuela cocaine." Finally, Ms. Ramirez testified that she could not confirm Henry Orjuela's involvement in the 500 kilogram deal.

The government nevertheless proceeded to trial without making any further presentation to the grand jury. However, it abandoned the theory that Mr. Orjuela con-

---

**1.** The government informs the court that in an October 30, 1992 debriefing of a new cooperating witness with close ties to Jaime Orjuela, the witness volunteered that Jaime had told him that threats were communicated to Roberto in connection with testifying. As this information reached the government *after* Henry Orjuela's trial, it is not relevant to whether the government had a duty to correct prior misrepresentations presented to the grand jury.

spired to import the 500 kilograms of cocaine and instead alleged a conspiracy to run a cocaine business between Henry Orjuela and his brothers Jaime and Gilberto.

### B. *Power to Dismiss Post–Conviction Indictments*

Henry Orjuela moves to dismiss the indictment against him based on the prosecuting attorney's failure to reconvene the grand jury and correct the inaccurate and misleading information upon which Mr. Orjuela's indictment rested. The government makes two arguments in response to this motion: first, that this court lacks power to dismiss the grand jury indictment; and, second, that disregarding any false material presented to the grand jury, the government nevertheless presented sufficient valid evidence against Henry Orjuela to enable the grand jury to indict.

■ With respect to the government's second argument, the presence of "sufficient evidence" clearly does not absolve the United States prosecuting attorney of its responsibility to ensure that justice in those proceedings is duly executed. *See United States v. Williams,* — U.S. —, —— ——, 112 S.Ct. 1735, 1749–51, 118 L.Ed.2d 352 (1992) (Stevens, J., dissenting) (discussing prosecutor's duty to protect fundamental fairness of grand jury proceedings); *United States v. Hogan,* 712 F.2d 757, 759–60 (2d Cir.1983) (describing grand jury's purpose and prosecutor's obligation "to ensure that justice is done."). Furthermore, it is not the responsibility of an individual representative of the government to determine whether evidence is in fact "sufficient" to indict; that responsibility lies with the grand jury alone. *See Stirone v. United States,* 361 U.S. 212, 218–19, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960) ("The very purpose of the requirement that a man be indicted by a grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."); *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956) (barring courts from looking behind face of indictment to determine if evidence upon which indictment rests is reliable or sufficient); *see also United States v. Mechanik,*

475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50 (1986) (focusing on whether government's misconduct "substantially influenced" grand jury's decision to indict) (O'Connor, J., concurring in judgment). Accordingly, whether or not the government can show that sufficient valid evidence remained to indict Mr. Orjuela is secondary to the question of whether prosecutorial misconduct in this case eroded the grand jury's purpose and therefore prejudiced the defendant.

■ Based upon the government's first argument, however, this court regrettably must deny defendant's motion. Consideration of two Supreme Court cases—*United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) and *United States v. Williams,* — U.S. —, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992)—compels the conclusion that this court lacks power to remedy the government's apparent abuse of its power.

In *Mechanik,* 475 U.S. at 70, 106 S.Ct. at 941, the Supreme Court held that a verdict of guilty by a petit jury rendered dismissal of a wrongly obtained indictment inappropriate. The precise issue presented in *Mechanik* was whether the simultaneous appearance of two witnesses before a grand jury, in violation of Rule 6(d) of the Federal Rules of Criminal Procedure, was "harmless error" given that the jury convicted the defendant of the criminal charges against him. *Id.* at 69–70, 106 S.Ct. at 941. Writing for the majority, Chief Justice Rehnquist approved the district court's focus on the outcome of trial rather than on proceedings before the grand jury, explaining:

> [T]he subsequent guilty verdict not only means that there was probable cause to believe that the defendants were guilty as charged, but that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 70, 106 S.Ct. at 941–42.

In an intelligent and oft-cited concurrence, Justice O'Connor, joined by Justices

Blackmun and Brennan, voiced her disagreement with the state of the proceedings upon which the majority chose to focus its analysis. *Id.* at 76–77, 106 S.Ct. at 944–45 (O'Connor, J., concurring in judgment). Rejecting the standard announced by the Chief Justice as encouraging district court delay in resolving such motions, Justice O'Connor advocated adopting the following standard:

> [T]he remedy of dismissal of the indictment is appropriate if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt as to whether it had such effect. The focus of the prejudice inquiry should be on the effect of the alleged error on the grand jury's decision to indict even if the court postpones its decision until the conclusion of the trial.

*Id.* at 78, 106 S.Ct. at 945 (O'Connor, J., concurring in judgment) (citations omitted). Employing this analysis, she found that the two witnesses' simultaneous presence before the grand jury did not "substantially influence" that proceeding. *Id.* at 79, 106 S.Ct. at 946 (O'Connor, J., concurring in judgment).

Despite the *Mechanik* majority's holding, the Supreme Court nevertheless left open the possibility that a court might exercise its supervisory power and dismiss an indictment—even post-conviction—when prosecutorial acts of misconduct misled or misinformed the grand jury. *See United States v. Brito*, 907 F.2d 392, 394–95 (2d Cir.1990) (reluctantly declining to exercise supervisory authority to dismiss indictment post-conviction but explaining that power to do so exists). In *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), the Court acknowledged its power to dismiss an indictment because of misconduct before the grand jury when that conduct "is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process" or when the con-

duct "otherwise may have influenced substantially the grand jury's decision to indict, or whether there is grave doubt as to whether the decision to indict was so influenced." *Id.* at 259, 108 S.Ct. at 2376.[2] A prosecutor's knowledge that grand jury witnesses were committing perjury, alluded the Court, constituted one example of misconduct for which this remedy might be appropriate. *See id.* at 261, 108 S.Ct. at 2377 ("In light of the record, the finding that the prosecutors *knew the evidence to be false and misleading,* or that the Government caused the agents to testify falsely is clearly erroneous. Although the Government may have had its doubts about the accuracy of certain aspects of the summaries, this is quite different from having knowledge of falsity.") (emphasis added). The Supreme Court also agreed with the Court of Appeals that the District Court's reliance on post-indictment prosecutorial misconduct was improper because the violations were unrelated to the grand jury's "independence and decisionmaking process." *Id.* at 258, 108 S.Ct. at 2375; *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir.1992); *see also Bracy v. United States*, 435 U.S. 1301, 98 S.Ct. 1171, 55 L.Ed.2d 489 (1978) (Rehnquist, J., as Circuit judge) (denying request for stay pending certiorari determination and declining to find prosecutorial duty to correct grand jury testimony that later turns out to be false).

While Mr. Orjuela might be able to establish the showing of prejudice that *Bank of Nova Scotia* requires, the Supreme Court's latest pronouncement on the judiciary's supervisory power over the grand jury— *United States v. Williams*—sounds a death knell for Orjuela's arguments. The specific issue presented in *Williams* was whether the federal courts possess authority to dictate standards of prosecutorial conduct before a grand jury—and specifically to require disclosure to the grand jury of "substantial exculpatory evidence in [the prosecutor's] possession." *Id.,* —— U.S. at

---

**2.** However, even in so quoting the language from Justice O'Connor's *Mechanik* concurrence, the *Bank of Nova Scotia* Court did not abandon the harmless-error standard since *Bank of Nova*

*Scotia* involved a motion for the dismissal of an indictment prior to the conclusion of trial. 487 U.S. at 256, 108 S.Ct. at 2374.

——, 112 S.Ct. at 1741. Writing for the majority, Justice Scalia reached back to the historical and institutional underpinnings of this investigative body to remind his audience that a grand jury belongs to no branch of government but rather serves as a "buffer or referee between the Government and the people." *Id.,* —— U.S. at ——, 112 S.Ct. at 1742–43. He nevertheless concluded that the rule requiring presentation of exculpatory evidence:

> would neither preserve nor enhance the traditional functioning of the institution that the Fifth Amendment demands. To the contrary, requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body.

*Id.,* —— U.S. at ——, 112 S.Ct. at 1744.[3] Irrespective of how misleading the absence of such evidence might be, the Court declined to oversee the prosecutor's presentation to the grand jury.

The Supreme Court's holding in *Williams* was not confined to exculpatory evidence as Mr. Orjuela asserts. Rather, in what appears to be a clear narrowing of the *Bank of Nova Scotia* opinion, the *Williams* majority limited the judiciary's supervisory power over grand jury proceedings in general:

> *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), makes clear that the supervisory power can be used to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those "few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions," *United States v. Mechanik,* 475 U.S. 66, 74, 106 S.Ct. 938 [943], 89 L.Ed.2d 50 (1986) (O'CONNOR, J., concurring in judgment).

We did not hold in *Bank of Nova Scotia,* however, that the courts' supervisory power could be used, not merely as a means of enforcing or vindicating legally compelled standards of prosecutorial conduct before the grand jury, but as a means of *prescribing* those standards of prosecutorial conduct in the first instance—just as it may be used as a means of establishing standards of prosecutorial conduct before the courts themselves. It is this latter exercise that respondent demands. Because the grand jury is an institution separate from the courts, over whose functioning the courts do not preside, we think it clear that, as a general matter at least, no such "supervisory" judicial authority exists, and that the disclosure rule applied here exceeded the Tenth Circuit's authority.

*Id.,* —— U.S. at ——, 112 S.Ct. at 1741–42 (emphasis in original). *Williams* therefore calls into question the continued viability of the Circuit court cases upon which Orjuela's argument relies. *See United States v. Gillespie,* 974 F.2d 796, 800–01 (7th Cir. 1992) (questioning viability of cases predating *Williams* that discuss supervisory power over grand jury); *see, e.g., United States v. Hogan,* 712 F.2d 757, 761 (2d Cir.1983) ("The law in this Circuit is that dismissal of an indictment is justified to achieve either of two objectives: to eliminate prejudice to a defendant; or, *pursuant to our supervisory power, to prevent prosecutorial impairment of the grand jury's independent role.*") (emphasis added).

Surely the government's failure to reconvene the grand jury in this case constituted arrogance and irresponsibility of the most dangerous kind. To ensure the due execution of justice the government *should have* corrected its prior misrepresentations to the grand jury concerning Mr. Orjuela—both with respect to the false evidence against him[4] and with respect to the mis-

---

**3.** Part of the reasoning upon which the *Williams* holding rests is the recognition that the subject of an investigation is not entitled to present, nor a grand jury required to consider exculpatory evidence. *Id.,* —— U.S. at ——, 112 S.Ct. at 1744–45.

**4.** This evidence includes the taped phone conversation of August 22 and the availability of 2000 kilograms of cocaine as evidence at trial.

statements about Roberto's reliability.[5] But Henry Orjuela was convicted by a petit jury after a full trial. And the prosecutor's misconduct did not violate the Constitution, an applicable statute, or one of the Federal Rules of Criminal Procedure. *See Williams,* — U.S. at ——, 112 S.Ct. at 1741. Accordingly, after serious consideration of the interplay between *Mechanik, Bank of Nova Scotia* and *Williams,* this court in good conscience cannot grant Mr. Orjuela's motion.

In light of the government's disturbing exercise of its power and discretion, this court refuses to render its decision without echoing the words of Justice Stevens in his *Williams* dissent which, in essence, urge reconsideration of the current grand jury doctrine:

> We do not protect the integrity and independence of the grand jury by closing our eyes to the countless forms of prosecutorial misconduct that may occur inside the secrecy of the grand jury room. After all, the grand jury is not merely an investigatory body; it also serves as a "protector of citizens against arbitrary and oppressive governmental action.... It blinks reality to say that the grand jury can adequately perform this important historic role if it is intentionally misled by the prosecutor—on whose knowledge of the law and facts of the underlying criminal investigation the jurors will, of necessity, rely.... Such a sharp break with the traditional role of the federal judiciary is unprecedented, unwarranted and unwise. Unrestrained prosecutorial misconduct in grand jury proceedings is inconsistent with the administration of justice in the federal courts and should be redressed in appropriate cases by the dismissal of indictments obtained by improper methods.

*Williams,* — U.S. at ——, 112 S.Ct. at 1753 (Stevens, J., dissenting). Based upon governing precedent and the facts presented above, Orjuela's motion to dismiss his indictment is hereby denied.

## II. CONSTRUCTIVE AMENDMENT OF INDICTMENT

■ In addition to calling into question the proceedings before the grand jury, Mr. Orjuela argues that the government constructively amended the indictment at trial in violation of his fifth amendment right to be indicted by a grand jury. Specifically, he claims that the government put evidence before the grand jury relating to the 500 kilogram shipment of cocaine and the additional 1500 kilograms of cocaine in Guatemala but did not present that evidence at trial. Orjuela also complains that the indictment named several co-conspirators about whom the government offered no evidence at trial; instead, the evidence at trial centered around persons not specifically mentioned—but referred to as "others"—in the indictment. In sum, Orjuela argues that the government "attempted to prove an entirely different conspiracy" than the one upon which the grand jury indicted, and he therefore moves this court to order a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

■ Constructive amendment of an indictment occurs "when the proof at trial broadens the basis of conviction beyond that charged in the indictment." *United States v. Patino,* 962 F.2d 263, 265 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 354, 121 L.Ed.2d 268 (1992). This *per se* violation of the fifth amendment is distinct from a variance from the indictment, which occurs "when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment"; a variance justifies a new trial only when the defendant is prejudiced. *United States v. Weiss,* 752 F.2d 777, 787 (2d Cir.) (*quoting United States v. Pelose,* 538 F.2d 41, 45 n. 8 (2d Cir.1976), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985); *United States v. Zingaro,* 858 F.2d 94, 98 (2d Cir.1988).

---

**5.** Admittedly, this evidence rebutting Roberto's credibility could be characterized as exculpatory.

■ While urging special vigilance in examining indictments on conspiracy charges, *see United States v. Roshko*, 969 F.2d 1, 4–5 (2d Cir.1992) (*citing United States v. Mollica*, 849 F.2d 723 (2d Cir.1988)), the Second Circuit repeatedly has looked to the precise language of the disputed indictment to determine whether either an amendment or a variance has occurred. As is clear from the face of the indictment in this case, Mr. Orjuela was charged with a conspiracy to import cocaine into the United States. The entire indictment reads as follows:

> From in or about and between January 1989 and February 1991, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HENRY ORJUELA, CARLOS ARTURO ORJUELA, JOSE RAMIREZ, also known as "Fernando Ramirez," also known as "Papo," DORA LONDONO, also known as "Cornelia," MONICA URREGO, and NURY VERGARA, also known as "Nurys Vergara Barriga," "Nuriz Vergara," "Nury Macias," "Noria Corazon," and "Corazon," and others, did knowingly and intentionally conspire to import into the United States from a place outside thereof five kilograms or more of a substance containing cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Section 952(a). (Title 21, United State Code, Sections 963, 960(a)(1) and 960(b)(1)(B)(ii); Title 18, United States Code, Sections 3551 *et seq.*).

No constructive amendment occurs where a generally framed indictment encompasses the specific legal theory or evidence used at trial. *United States v. Morgenstern*, 933 F.2d 1108, 1115 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1188, 117

L.Ed.2d 430 (1992) (*citing United States v. Miller*, 471 U.S. 130, 136–40, 105 S.Ct. 1811, 1814–17, 85 L.Ed.2d 99 (1985)); *Zingaro*, 858 F.2d at 99 ("The Supreme Court has made it clear, however, that an indictment drawn in more general terms may support a conviction on alternative bases, even though an indictment with specific charging terms will not.") (*citing Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960)). Consequently, the fact that the government did not produce evidence at trial regarding the specific 500 kilograms of cocaine or about some of the named coconspirators did not impermissibly broaden this indictment.[6] Furthermore, despite the artless language "and others," the indictment nevertheless informed Mr. Orjuela of the "core of criminal conduct" for which he was charged. *Patino*, 962 F.2d at 266.

Orjuela urges this court to look beyond the language of the indictment to consider whether the evidence presented to the grand jury supported the government's theory at trial. The extent to which a court facing this type of motion may look beyond an indictment to consider the content of the grand jury proceedings is unclear. Nevertheless, after reading the grand jury minutes in this case, this court concludes that the government did not constructively amend the indictment. Although the testimony of Special Agent Vick focused upon the cocaine importation scheme orchestrated by Roberto, the grand jury heard evidence of Henry Orjuela's broad involvement in narcotics trafficking—only one part of which involved the specific 500 kilogram transaction. Thus, defendant was convicted of the same general charge for which he was indicted.

---

**6.** As the *Weiss* court explained:

"This circuit has been reluctant to construe an alleged 'shift' in the government's theory or proof as a constructive amendment that would require reversal of a conviction 'without regard to whether defendant was prejudiced by a difference between the indictment and the proof.' *United States v. Heimann*, 705 F.2d 662, 665–66 (2d Cir.1983). *See United States v. Sindona*, 636 F.2d 792 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). Rather, this circuit has

treated any differences between the indictment and the proof as variances which do not require reversal absent a showing that the variance caused substantial prejudice to the defendant. *See United States v. Knuckles*, 581 F.2d 305, 312 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *Sindona*, 636 F.2d at 798").

*See Weiss*, 752 F.2d at 790. Mr. Orjuela suffered no prejudice at trial as he was informed that the government would not be basing its case on the 500 kilogram scheme.

For all the reasons described above, this court hereby denies Mr. Orjuela's motion for a new trial based on constructive amendment of the indictment.

### III. INSUFFICIENT EVIDENCE TO CONVICT

■ In his final motion Mr. Orjuela contends that the evidence introduced by the government at trial was insufficient to convict him because it did not prove that he was a member of a conspiracy. Accordingly, he moves this court to enter a judgment of acquittal pursuant to Rule 29. A defendant challenging the sufficiency of evidence at trial faces a heavy burden. *United States v. Ragosta*, 970 F.2d 1085 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 608, 121 L.Ed.2d 543 (1992). This court must uphold the jury verdict if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original), and it must construe all permissible inferences in the government's favor. *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983).

Applying this standard, defendant's Rule 29 motion must be dismissed. The direct and circumstantial evidence produced at trial could have led a reasonable juror to conclude that the Orjuela brothers were involved in a conspiracy to import narcotics into this country and that Henry Orjuela was a part of that conspiracy. Consequently, since a "reasonable mind might fairly [have concluded his] guilt beyond a reasonable doubt," *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972), this court must deny Mr. Orjuela's motion for a judgment of acquittal.

SO ORDERED.